IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOSHUA RABEL, ANDREA RABEL
AND N.R., a minor,

                        Plaintiffs,                              OPINION AND ORDER

            v.                                                      20-cv-821-bbc

NEW GLARUS SCHOOL DISTRICT,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        Plaintiff N.R. is a child with profound cognitive disabilities who attended school in

the New Glarus School District, where she received special education services under an

Individualized Education Plan (IEP).  Upon entering sixth grade in the fall of 2018, she had

frequent episodes of unregulated, aggressive and dangerous behavior, including running out

of the school building on several occasions and kicking, hitting, and throwing objects at staff.

In October 2018, N.R.'s IEP team, which included her parents, plaintiffs Joshua and Andrea

Rabel, added a Behavior Intervention Plan (BIP) to her IEP to permit staff to use restraint

or seclusion when N.R.'s behavior escalated and posed a threat to herself or others.  In

accordance with that plan, district staff physically restrained or secluded N.R. on numerous

occasions for the rest of the 2018-2019 school year.

        In this action brought under 42 U.S.C. § 1983, N.R. and her parents allege that in

47 instances, district staff violated N.R.'s Fourth Amendment rights by using excessive force

and unlawfully restraining her.  Plaintiffs have not sued any of the individual staff members

but instead seek to hold the district liable for the alleged violations under the holding of Monell v. Dept. of Soc. Services, 436 U.S. 658 (1978).

Defendant New Glarus School District has moved for summary judgment. Dkt. #17. Defendant supports its motion with affidavits from the district staff involved in each of the 47 alleged incidents, in which they describe N.R.'s behavior and the staff response. Although defendant concedes that its employees at times used "restraint" or "seclusion" as those terms are defined under Wisconsin law, it maintains that each seizure or use of force was objectively reasonable under the Fourth Amendment in light of N.R.'s unregulated and dangerous behavior. Defendant further contends that plaintiffs have no evidence to support their claim that the alleged constitutional violations were caused by deliberate actions by the district. Plaintiffs argue that genuine disputes of fact concerning each incident preclude this court from finding that defendant's employees did not violate N.R.'s right to be free from unreasonable seizures and they contend that the district is liable because the unconstitutional conduct of its employees was explicitly called for by N.R.'s IEP.

Defendant's motion for summary judgment will be granted. As discussed in more detail below, plaintiffs' response to the motion is inadequate. With respect to the facts, plaintiffs have failed to propose their own version of the facts supported by citations to the record. Instead, they have presented their own version of events in lengthy responses to facts proposed by defendant. In addition, they do not explain why staff's conduct during any particular incident was unreasonable or cite any controlling federal constitutional law

2

in support of their arguments.  (Their citations to state law are not helpful in a case brought under federal law.)

In the end, plaintiffs have failed in two respects: they have not shown why the disputes they refer to are material to their claim that the district violated N.R.'s constitutional rights or that a jury trial is necessary on the question whether defendant's employees unreasonably seized or used excessive force in any of the 47 incidents they allege. Finally, even if plaintiffs could show that district staff violated N.R.'s constitutional rights on one or more occasions, summary judgment is still appropriate because plaintiffs have not shown that the district itself, rather than its employees, was the moving force behind the violations.

Before setting out the facts, I note that many of plaintiffs' proposed responses to defendant's proposed facts fail to conform to this court's procedures on summary judgment either by failing to cite admissible evidence in the record or by including additional facts not directly responsive to the fact proposed by defendant.  In accordance with this court's Procedure to be Followed on Motions for Summary Judgment, I have disregarded these facts. Id.  § II.D.4  ("The court will disregard any new facts contained in response to a proposed finding of fact that are not directly responsive to the proposed fact.") and § II.E.2 ("The court will not consider any factual propositions made in response to the moving party's proposed facts that are not supported properly and sufficiently by admissible evidence."). The following facts are undisputed unless otherwise noted.

FACTS

A. Background

N.R. is the biological daughter of plaintiffs Joshua Rabel and Andrea Rabel.  N.R. was given a diagnosis of Down's Syndrome shortly after her birth.  Plaintiffs' claims in this case arise from events that occurred during the 2018-19 school year, when N.R. was a sixth grade student in the New Glarus Middle School Special Education Program.  (As a result of her disability, N.R. is not competent to testify about these events.)

Upon entering sixth grade, N.R. had an Individualized Education Plan (IEP), dated May 25, 2018, which set out the special education and related services that she would receive from the school district in order to receive a free appropriate public education. Among other things, she would have a full time educational assistant and receive approximately half of her instruction in the special education resource room.

N.R.'s sixth grade year did not begin well.  From the beginning of the school year until October 22, 2018, she ran in the school hallways three times, ran out of the school building five or six times, and was aggressive to school staff 11 times.  Many of the running episodes occurred when N.R. was completing a hallway transition.  N.R.'s behavior towards staff included kicking, scratching, spitting, and throwing objects at them.  District staff determined that N.R. posed a very high risk of running out of the school and into the road or throwing heavy objects at staff or students when she became unregulated.

4

### B. N.R.'s October 2018 IEP

In an email dated October 18, 2018, plaintiff Andrea Rabel wrote that it was not safe for N.R. to be running out of the building and asked school district staff if there was a behavioral plan for N.R. that allowed district staff to restrain N.R. to keep her safe. N.R.'s IEP team, which included Andrea and Joshua Rabel, met on October 22, 2018 to update N.R.'s IEP. The IEP team revised N.R.'s IEP to provide for the use of a Behavioral Intervention Plan (BIP) when N.R. exhibited unexpected behaviors that could lead to unsafe aggression toward staff and running from the building. The BIP established a number of preventive and less restrictive supports to be used with N.R., which included a structured visual schedule, visual prompts, social stories, limited verbal directions, giving additional time for processing before repeating directions, using "first, then" language, using universal terms of "unexpected" and "check your schedule," allowing N.R. to have her own physical work space, and a reward system. The plan also called for "arm-in-arm" transport to be used as a positive and preventive support during hallway transitions, given N.R.'s struggles with those transitions. During an arm-in-arm (sometimes called a "two person") transport, N.R. was able to freely move her torso, arms, legs, and head. (Plaintiffs dispute that N.R. could move her arms during an arm-in-arm transport, but their evidence is insufficient to raise a genuine dispute. In any event, this dispute is immaterial, as discussed below.)

The IEP called for the use of physical restraint or seclusion when N.R. "and/or staff is in danger" "[w]hen [N.R.] displays aggressive behaviors which and/or which lead to running out of building putting her self at risk." Oct. 2018 IEP, attached to Krantz Dec.,

dkt. #23, exh. 4.  The October 2018 BIP prescribed a step-by-step plan to use if N.R.'s behavior became aggressive, which was defined as "trying to escape, hitting, kicking[,] throwing objects, spitting, etc."  If N.R. demonstrated these behaviors, then staff members were to use physical restraint to take control until N.R. was ready to not be restrained. When she was ready to not be restrained, N.R. was to do "head down" at her desk for 30 seconds and then go back to the task as directed.  (According to defendant, "head down" was a term used in elementary school that N.R. understood to be a "time out," but plaintiffs dispute that N.R. understood this.)

The BIP also gave staff a step-by-step plan to use if N.R. ran out of the room:  staff members were to say "Stop N.," call office staff to get backup to the location, and use physical restraint to take N.R. back to N.R.'s "office," where N.R. was to do "head down" at her desk for 30 seconds before going back to the task directed.  (Because the special education room could not be used for seclusion for safety reasons, school district staff made a small group workspace for N.R. called "N.R.'s Office.")  The BIP indicated that three types of "holds" could be used:  a standing position-2 person hold (also described as "1-2-3 Move"); a child's position hold; and a team control position hold.

All of the staff members involved in carrying out the BIP were certified in non-violent crisis intervention. These individuals were Special Education Director Jennifer Krantz; Special Education teachers Nicole Ruegsegger, Heather Cassidy, and Melissa Holland; Principal Mark Stateler; and Education Assistant Jennifer Wilde.

During the October 2018 IEP meeting, the IEP team agreed that it was necessary to share information to assist in determining how to help N.R. reduce aggression.  Accordingly, the team decided that the teachers would send daily notes to N.R.'s parents.  On October 23, 2018, district staff began following the revised IEP and sending daily notes, to the Rabels, first via email and then via a Google document.  When district staff used physical restraint or seclusion, Krantz created a separate incident report.

## C.  The Incidents at Issue

During discovery in this lawsuit, plaintiffs alleged 47 incidents of alleged excessive force and unlawful seizure of N.R. during the 2018-19 school year.  These allegations are founded upon the contemporaneous daily notes sent by school staff documenting N.R.'s school day, her behavior, and staff's response to them.  Neither Andrea nor Joshua Rabel witnessed any of the incidents.  They are aware of only two incidents in which N.R. might have been injured:  (1) she had red marks on her arm on October 23, 2018; and (2) she had a small scratch on her right forearm on May 31, 2019.  Neither of these injuries required medical attention.

Precisely what occurred during 47 of these incidents is a matter of dispute between the parties.  I address this dispute below.

OPINION

## I.  Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit."  Anderson, 477 U.S. at 248.  A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  In deciding a motion for summary judgment, the court views the facts in the light most favorable to the non-moving parties.  Crull v. Sunderman, 384 F.3d 453, 460 (7th Cir. 2004).

## II.  Plaintiffs' §1983 Claim

To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  "[T]he first step in any [§ 1983] claim is to identify the specific constitutional right infringed."  Albright v. Oliver, 510 U.S. 266, 271 (1994).

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., Amend. IV.  The Fourth Amendment applies within the

school setting, and it is not limited to actions taken for law enforcement purposes.  New Jersey v. T.L.O., 469 U.S. 325, 336–37 (1985).  However, "the setting and the purpose of actions undertaken outside the typical law enforcement context profoundly affect their reasonableness."  Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1250 (10th Cir. 2008); Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (the rights of students "must be applied in light of the special characteristics of the school environment") (internal quotation and citation omitted).

Because public school students are in a unique position and enjoy "less than the full constitutional liberty protection afforded those persons not in school," deprivations of liberty in schools often "serve the end of compulsory education and do not inherently pose constitutional problems."  Wallace by Wallace v. Batavia School Dist. 101, 68 F.3d 1010, 1014 (7th Cir. 1995).  To maintain order and discipline, a teacher or administrator may need to seize a student "in the face of provocative or disruptive behavior."  Id.  A school official who seizes a student violates the Fourth Amendment "only when the restriction of liberty is unreasonable under the circumstances then existing and apparent."  Id.; see also Price as next friend of J.K. v. Mueller-Owens, 516 F. Supp. 3d 816, 828 (W.D. Wis. 2021) (applying Wallace to student's unlawful seizure and excessive force claims).  In evaluating reasonableness, courts may consider factors such as the school context, the student's age, size, and demeanor, relationship between the need for force and the amount used, the extent of the student's injury, whether the student presented a safety concern, and whether the student was actively resisting.  Price, 516 F. Supp. at 828 (citations omitted).

In support of summary judgment, defendant proposed facts about the 47 incidents involving N.R., supported by affidavits from the staff members who were involved. According to defendant, N.R.'s dysregulated behavior continued throughout the 2018-19 school year, and included numerous instances of aggression, including kicking, grabbing at, slapping, and elbowing staff, tearing things off the walls, and throwing objects.  Defendant denies that staff restrained N.R. during 21 of these incidents.  With respect to those instances in which they acknowledge that some form of restraint or seclusion was used, defendant describes how and for how long the restraint occurred.  Staff's actions included lifting N.R. to her chair, using a two-person transport to move N.R. to her office or another room for a time out, putting their hands on N.R.'s shoulders to keep her in her chair, and holding her arms or legs to prevent her from hitting or running.  Defendant maintains that in each instance in which restraint was used, N.R.'s behavior presented an imminent risk to her safety or that of others, that no less restrictive interventions were available, and that the degree and duration of restraint used were only that required to reduce the risk.

In response to defendant's proposed facts, plaintiffs generally do not dispute that N.R. engaged in the behaviors described by staff or that staff responded as they reported. However, they "dispute" the chronology of many of defendant's proposed facts on the ground that they "do not appear consistent" with defendant's contemporaneous notes of each incident.  Plaintiffs then proceed to offer their own interpretation of the incident based on defendant's contemporaneous records.  Plaintiffs' response to defendant's Proposed Finding of Fact 117 provides one example:

Defendant's PPFOF 117:  On November 14, 2018, N.R. was directly hitting, scratching, and throwing balls off chairs at staff and slamming the table into the wall causing it to break through the drywall.

Response:  Plaintiffs do not dispute these events took place during a longer series of events in which staff and N.R. were in an escalating confrontation that appeared to begin over N.R. giggling and making faces instead of following staff directions, when she had already been placed in seclusion in N.R.'s Office.

In support, plaintiffs cite page 78 of Exhibit 1. Exhibit 1 is a chart prepared by plaintiffs titled "Supplementary listing and description of specific indents . . . and source documents." Dkt. #33-1.  However, there is no page 78 to Exhibit 1.  It appears that plaintiffs are referring to page 19 of Exhibit 2, which is the daily note prepared by office staff describing N.R.'s day on November 14, 2018.  See dkt. #33-2, 18-19.  Plaintiffs take this same approach to numerous other facts proposed by defendant.  See Responses Nos. 48-59, 62-66, 68-70, 73-74, 77-79, 81-82, 88, 90-94, 102, 107-08, 111, 113-114, 119-120, 130, 135, 137-38, 140, 143-45, 151, 153, 156, 160, 163-64, 167, 171, 177-78, 180, 185-86, 193-94, 195, 200, 202.

This approach is improper.  As noted previously, this court's procedures on summary judgment make clear that responses to proposed findings of fact must be limited to those facts that are directly responsive to the moving party's proposed fact.  If plaintiffs wanted to propose a different chronology of events based on the contemporaneous records, they should have proposed their own facts, supported by specific citations to the records.  Further, the place to "interpret" the facts (such as arguing that N.R. was "in seclusion," as in the example above) is in the briefs, not the responses to the movant's facts.  Simply citing to the

entirety of defendant's corresponding daily note and asking the court to find a material dispute based on plaintiffs' interpretation of the lengthy note violates this court's procedures on summary judgment.  See Procedure to be Followed on Summ. Judg. § II.E. ("The court will not search the record for evidence [or] consider any factual propositions made in response to the moving party's proposed facts that are not supported properly and sufficiently by admissible evidence.").

Plaintiffs' legal presentation is also deficient.  As an initial matter, they mention only a handful of the 47 incidents in their brief, citing these as "examples" of those in which material facts are in dispute.  Br. in Opp., dkt. #35, at 5 (mentioning six incidents). Plaintiffs then argue that "multiple instances of force could be found unreasonable" because a jury could reasonably conclude that "several" of the incidents appeared to involve the use of physical restraint not permitted under Wis. Stat. § 118.305.  Id. at 6-7.  Plaintiffs do not identify these incidents, analyze them in any way, or explain the basis for their claim that the force used during any particular incident violated state law.  Even more problematic, they fail to develop any argument to show that staff's actions, evaluated within the framework of Wallace and other federal cases, violated N.R.'s constitutional rights.  It is well-settled that "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws[.]" Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003); see also Wozniak v. Adesida, 932 F.3d 1008, 1011 (7th Cir. 2019) ("[A] constitutional suit is not a way to enforce state law through the back door."); Thompson v. City of Chicago, 472 F.3d 444, 454 (7th Cir. 2006) ("the violation of police regulations or even a state law is completely immaterial as to

the question of whether a violation of the federal constitution has been established"); <u>United States v. Janik</u>, 723 F.2d 537, 549 (7th Cir. 1983) (whether conduct violates the Fourth Amendment does not depend on whether officers "turned out to be mistaken and may have exceeded . . . their authority under state law").

Plaintiffs must do more than rely on claimed factual disputes and perfunctory citations to state law to establish that material facts exist from which a jury could find that any of defendant's employees violated N.R.'s constitutional rights.  Plaintiffs' job is to identify and explain the specific arguments that support their claims, within the context of relevant legal authority.  <u>White v. United States</u>, 8 F.4th 547, 552 (7th Cir. 2021)("[T]his court has repeatedly and consistently held that perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.").

If there is a general theme to be discerned from plaintiffs' presentation, it is that staff provoked many of N.R.'s aggressive acts by restraining or secluding her before it was necessary, thereby causing her behavior to escalate.  However, even if I give plaintiffs the benefit of the doubt and assume that they could show that staff unreasonably restrained N.R. on one or more occasions, they still cannot defeat summary judgment.  Plaintiffs do not seek relief from any of the staff members.  Instead, plaintiffs seek to impose liability for each alleged deprivation of N.R.'s Fourth Amendment rights on the New Glarus School District under the holding of <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658 (1978).  Under <u>Monell</u>, a local government entity like the school district can be held responsible for constitutional violations only when the entity itself caused the deprivation of rights; the

13

mere fact that it employed the unconstitutional actors is not enough.  Id. at 691-695; see also Bd. of Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997) (collecting cases and reinforcing the point that the doctrine of *respondeat superior* does not apply under § 1983).  To establish this responsibility, plaintiffs must prove that the constitutional violation was caused by a governmental "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  Monell, 436 U.S. at 694.

There are three types of actions that can support municipal liability under § 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority."  First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago, 988 F.3d 978, 986 (7th Cir.), cert. denied sub nom. First Midwest Bank v. City of Chicago, 142 S. Ct. 389 (2021) (quoting Spiegel v. McClintic, 916 F.3d 611, 617 (7th Cir. 2019)).

In addition to proving a municipal action, a plaintiff seeking to establish liability under Monell must prove: (1) culpability, meaning, at a minimum, deliberate conduct; and (2) causation, which means the municipal action was the "moving force" behind the constitutional injury.  Ruiz-Cortez v. City of Chicago, 931 F.3d 592, 598 (7th Cir. 2019) (citing Bd. of Cty. Comm'rs, 520 U.S. 397, 404–07).  Stated another way, the question is whether there is a "direct causal link," City of Canton, Ohio v. Harris, 489 U.S. 378, 386

14

(1989), between the violation and a "deliberate choice [by the municipality] to follow a course of action . . . made from among various alternatives." Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986).

In their complaint, plaintiffs alleged that the school district is liable for the alleged unconstitutional acts of seclusion and restraint, either because it "knowingly authorized" the violations by its employees or because it failed to adequately supervise and train them in spite of being on notice that N.R.'s Fourth Amendment rights were being violated.  Cpt., dkt. #1, ¶ 59.  However, on summary judgment, plaintiffs have not proposed any facts to support either of these theories or any other theory of municipal liability, for that matter. Instead, they argue that Monell liability exists because the district has affirmatively alleged that its employees followed N.R.'s IEP and BIP at all times.  As plaintiffs see it, the IEP represents a district policy.

Apart from their perfunctory declaration, plaintiffs do not set out any argument or cite any authority supporting their contention that N.R.'s IEP represented an official policy of the district.  As defendant points out, N.R.'s IEPs and BIPs were created by an IEP team comprised not only of various school district personnel but also of the Rabels and any other individuals whom N.R.'s parents invited to attend.  Plaintiffs do not argue that these individuals are lawmakers or that their acts may otherwise be fairly said to represent official district policy, nor do they cite any authority supporting their suggestion that an IEP, developed specifically to address the educational needs of a specific individual, is the sort of government edict or action upon which Monell liability can be found.  By failing to develop

15

their argument beyond their own conclusory assertion, plaintiffs have waived it.  Schaefer
v. Universal Scaffolding & Equip., LLC, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory
and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

Nevertheless, even if I assume that N.R.'s IEP represents an official district policy,
plaintiffs still fail to present any facts that would establish a plausible basis for a jury finding
of Monell liability.  "The express policy theory applies, as the name suggests, where a policy
explicitly violates a constitutional right when enforced."  Calhoun v. Ramsey, 408 F.3d 375,
379 (7th Cir. 2005).  To prevail on that theory, the plaintiff must "point to . . . language in
the . . . policy that is constitutionally suspect."  Id. at 381.  Plaintiffs argue cursorily that the
BIP was constitutionally suspect because it "called for the use of physical restraints and
forced seclusions in unreasonable manners—irrespective of safety needs and based on at
times arbitrary triggers."  Br. in Opp., dkt. #35, at 8.  To support this interpretation,
plaintiffs note that the BIP did not use the word "unsafe" or refer to safety concerns but
discussed restraint or seclusion only when N.R.'s behavior became "aggressive."  Response
to PPFOF, dkt. #33, Nos. 31 and 32.

Plaintiffs' interpretation of the BIP is not reasonable.  The BIP was not a stand-alone
document, but rather was developed and implemented as part of the October 2018 revision
to N.R.'s IEP.  The IEP provides for the "use of physical restraint or seclusion when student
and/or staff is in danger" "[w]hen [N.R.] displays aggressive behaviors which and/or which
lead to running out of building putting her self at risk."  The BIP further defined aggressive
behavior as "trying to escape, hitting, kicking[,] throwing objects, spitting, etc."  Thus,

contrary to plaintiffs' contention, the IEP did not authorize district staff to restrain N.R. arbitrarily, but only when she or staff were in danger, which the plan specified was when N.R. was behaving aggressively.  It is undisputed that when N.R. demonstrated aggressive behavior, she posed an extremely high risk of throwing objects at staff or students and running out of the building. Plaintiffs' contention that the IEP and BIP explicitly permitted use of restraint or seclusion even when safety was not a concern is not supported by a reasonable reading of the documents.

Plaintiffs also suggest that the IEP expressly authorized the unconstitutional use of force by authorizing the use of "arm locks to move N.R. by force."  Br. in Opp., dkt. #35, at 8.  Although plaintiffs do not identify any provision in the IEP containing this language, I will assume that they are referring to the provision of the BIP that provides that an "arm-in-arm" transport would be used during hallway transitions.  However, the BIP expressly listed arm-in-arm hallway transports as a "positive/preventative" support for N.R., not as a hold or a restraint.

Plaintiffs dispute this, citing an affidavit from Joshua Rabel.  Rabel averred that, from his review of surveillance video, which he says was consistent with his "observations," N.R. was not free to move her arms or control her body when she was escorted in this fashion. See Rabel Dec., dkt. #32, ¶ 8.  However, Rabel does not say how many times he observed staff escorting N.R. arm-in-arm, either on video or in person.  The mere fact that he saw staff using the arm-in-arm transport technique on an unspecified number of occasions in a way that appeared to restrict N.R. from moving her arms is not enough to show that the BIP

17

expressly authorized staff to restrain N.R. during all hallway transitions.  In any case, even if Rabel *is* correct that the BIP did contemplate that N.R.'s freedom of movement would be restricted during arm-in-arm hallway transports, he fails to explain why that fact alone would violate N.R.'s Fourth Amendment rights.  Given N.R.'s history of running out of the school building and the IEP team's agreement that hallway transitions were a trigger for N.R.'s dangerous behaviors, a provision calling for restrictions on N.R.'s movements would not necessarily be unreasonable.

Finally, regardless of the IEP's explicit terms, plaintiffs seem to overlook the fact that they consented to the IEP.  As other courts have noted, "[w]hile a parent's failure to object to an IEP does not waive their right to challenge, it 'casts significant doubt on [the parent's] contention that the IEP was legally inappropriate[.]'" T.G. ex rel. T.G. v. Midland Sch. Dist. 7, 848 F.Supp.2d 902, 916 (C.D. Ill. 2012) (quoting Carlisle Area School v. Scott P. By and Through Bess P., 62 F.3d 520, 536 n. 8 (3rd Cir. 1995)); see also B.G. by J.A.G. v. City of Chicago Sch. Dist. 299, 243 F. Supp. 3d 964, 978 (N.D. Ill. 2017) (quoting T.G.). Moreover, it is well-settled that "[a] person may voluntarily waive his Fourth Amendment rights[.]" United States v. Ahmad, 21 F. 4th 475, 478 (7th Cir. 2021) (quoting United States v. James, 571 F.3d 707, 713 (7th Cir. 2009)).  Having agreed that district staff could physically support or restrain N.R. as described in the IEP and BIP, plaintiffs are not in a strong position to argue that the restraint authorized was facially unlawful.  Indeed, if a parent's approval of an IEP is meaningless, then school districts will have little incentive to

engage in the collaborative dialogue with parents that is contemplated by the Individuals With Disabilities Act.

In sum, plaintiffs have not identified any constitutionally suspect language in the IEP or any other basis for finding the district liable for the alleged unconstitutional deprivations suffered by N.R. at the hands of district staff.  As a result, their case must be dismissed.


ORDER

IT IS ORDERED THAT defendant New Glarus School District's motion for summary judgment, dkt. #17, is GRANTED.  The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 1st day of February, 2022.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

19